UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PLAINS PIPELINE, L.P., PHILLIPS66 PIPELINE, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-398** |
| **GREAT LAKES DREDGE & DOCK COMPANY, GREAT LAKES DREDGE & DOCK COMPANY, LLC OF LOUISIANA, DAWN SERVICES, LLC,** *IN PERSONAM* **AND THE DREDGE TEXAS, TUGS PACIFIC DAWN AND COASTAL DAWN, AND THEIR ENGINES, TACKLE, FURNITURE, APPURTENANCES, ETC.** *IN REM* **DEFENDANTS** | **SECTION "K"(4)** |

### ORDER AND REASONS

Before the Court is a Motion for Summary Judgment (R. Doc. 39) filed by Defendants, Great Lakes Dredge & Dock, LLC and Great Lakes Dredge & Dock Company, LLC of Louisiana (collectively "Great Lakes") and against plaintiff, Phillips66 Pipeline, LLC ("Phillips"). Having reviewed the pleadings, memoranda, record, and relevant law, the Court, for the reasons assigned, grants the motion.

I. BACKGROUND

This case arises out of an allision between a dredging barge and an underwater oil pipeline. In 1953, Gulf Oil Company constructed and installed a pipeline running from Bay Marchand, Louisiana to Alliance, Louisiana, called the "BOA pipeline". (Def.'s Mem. Supp. Summ. J. 2, R. Doc. 39). The pipeline was then acquired by Chevron and subsequently sold to BP Oil Pipeline Company ("BP"); BP sold its interest in the pipeline to Plains, making Plains the

100% owner of the pipeline.[1] In May of 2007, plaintiffs Plains Pipeline L.P. ("Plains") and Phillips were assigned the rights, duties, and obligations of BP and TPC Pipeline company, as set forth in those original parties' Service Agreement and Operating Agreement. (Pl.'s Mem. Opp. Summ. J., 2, R. Doc. 48; *see also* Williams Aff. Ex. A ¶ 4, R. Doc. 48-1). BP, as "Pipeline Owner" or "Operator" under the agreements, assigned its rights to Plains and TPC Pipeline Company (and its parent corporation, Tosco Corporation) as "Pipeline Lessee" and "Refinery Owner", under the agreements, assigned its rights to Phillips. (Williams Affidavit, Ex. A ¶4, R. Doc. 48-1; Service and Operating Agreements Ex. B-C, 1, 19, 24, R. Docs. 48-2, 48-3). At the time of the incident in question, it is undisputed that Plains Pipeline owned the pipeline, while Phillips was the owner of the crude oil being transported in the pipeline. (Def.'s Mem. 3, R. Doc. 39; Compl. ¶ X-XI, R. Doc. 1). In addition, the Service and Operating Agreements were in effect at the time of the incident. (Williams Aff. Ex. A, ¶ 3, R. Doc. 48-1).

On March 17, 2012, the Dredge TEXAS, a cutter head and suction dredge owned by Great Lakes, and its flotilla entered Barataria Pass and proceeded to lower the cutter head onto the seafloor to fix the dredge's position. (Def.'s Mem. 2, R. Doc. 39). After the dredge was positioned, the dredge deployed two anchors to secure its position. *Id.* Phillips alleges that in lowering the cutter head of the Dredge TEXAS, the cutter head struck and damaged the BOA pipeline. (*Id.*; Pl.'s Opp. 1, R. Doc. 48).

Following the incident, according to the pipeline meter, a total of 204 barrels of crude oil were lost. (Def.'s Mem. 3, R. Doc. 39). The pipeline was then shut down. *Id.* at 5. As a result, Phillips incurred additional expenses in order to transport its crude oil during the pipeline's

---

[1] *Id.*; Form 10-Q Ex. 1, 12, R. Doc. 39-2; Compl. ¶ X, R. Doc. 1 ("At all material times, Plains was the owner and operator of a 12-inch Bay Marchand Ostrica-Alliance (BOA) pipeline, a section of which runs from Elmer's Island Junction to Ostrica and within the jurisdiction of this Court. The pipeline is used to transport crude oil and other petroleum products.").

repair. (Pl.'s Statement of Uncontested Facts 1, R. Doc. 48-6; Def.'s Statement of Uncontested Facts 2, R. Doc. 39-10). Phillips' expert submitted a report detailing Phillips' sustained damages including: Chevron inventory fee, freight charges, inspections charge, fuel charges, and lost product. (Def.'s Mem. 4, R. Doc. 39).

Great Lakes contends that, with the exception of the claim of damages for lost product, Phillips' claims are for purely economic damages resulting from the damage to the BOA pipeline and that because Phillips did not own the pipeline it cannot recover for such damages under the rule of *Robins Dry Dock and Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). (Def.'s Mem. 8-9, R. Doc. 39). Phillips does not contest that Plains owned the pipeline; however, Phillips argues that it maintained a proprietary interest sufficient to overcome the *Robins Drydock* bar as evidenced by the Service and Operating Agreements between Phillips and Plains. (Pl.'s Opp. 8, R. Doc. 48).

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco,* 76 F.3d 651 (5th Cir.1996) (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 912–13 (5th Cir. 1992)). However, if the nonmoving party would bear the burden of proof on a claim at trial, the moving party need not negate the elements of that claim, but only to "point out the absence of evidence supporting the nonmoving party's

case." *Brown v. Trinity Catering, Inc.* 2007 WL 4365384 (E.D.La. Dec. 11, 2007) (citing *Stults,* 76 F.3d at 656).

When the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pylant v. Hartford Life and Accident Insurance* Company, 497 F.3d 536, 538 (5th Cir.2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Summary judgment evidence must be "viewed in the light most favorable to the nonmovant, with all factual inferences made in the nonmovant's favor." *Bazan ex rel Bazan v. Hildago County,* 246 F.3d 481, 489 (5th Cir.2001) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513). However, as the Fifth Circuit has explained:

> [c]onclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment. The Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim.

*RSR Corporation v. International Insurance Company,* 612 F. 3rd 851, 857 (5th Cir. 2010).

### III. DISCUSSION

As stated above, Great Lakes brings their instant motion for summary judgment only as to Phillips' claims for economic losses[2] and avers that those claims are barred by the well-settled

---

[2] Def. Mem. 2 n. 1, R. Doc. 39.

rule set forth in *Robins Dry Dock* and expounded upon in *State of Louisiana ex rel. Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir. 1985) (en banc) that a plaintiff may not recover in an unintentional maritime tort suit "for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest," *Testbank*, 752 F.2d at 1022.³ "While other jurisdictions may have abandoned or relaxed the bright line rule of *Robins* and *TESTBANK*, this circuit 'has not retreated from *TESTBANK*'s physical injury requirement.'" *In re Taira Lynn Marine Ltd. No. 5,* LLC, 444 F.3d 371, 379 (5th Cir. 2006) (quoting *Reserve Mooring Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069, 1071 (5th Cir. 2001)); *see also In re Bertucci Contracting Co., L.L.C.,* 712 F.3d 245, 246-47 (5th Cir. 2013). The *Robins Drydock* "bright line" rule functions as a limitation liability in tort based on foreseeability, *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp*., 71 F.3d 198, 202-03 (5th Cir. 1995), and the Fifth Circuit has been "reluctant to recognize claims based solely on harm to the interest in contractual relations or business expectancy." *Louisville & N. R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469,

---

³ *See, e.g.*, *Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co*., 455 F.2d 957, 958 (5th Cir. 1972) (denying recovery where owner of production plant suffered losses from interruption of gas services due to damage to another owner's pipeline); *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469, 473-74 (1979); *Texas Eastern Trans. Co. v. McMoran Offshore Explor.,* 877 F.2d 1214, 1225 (5th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 321 (1989); *IMTT-Gretna v. Robert E. Lee SS,* 993 F.2d 1193, 1194 (5th Cir. 1993) (denying recovery where plaintiff, who leased a dock that was damaged, did not own, operate, control, or maintain the dock at issue); *Reserve Mooring Inc. v. Am. Commercial Barge Line, LLC*, 251 F.3d 1069, 1071-72 (5th Cir. 2001) (denying recovery where barge sinking and blocking mooring facility prevented use of plaintiff's facility); *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 379-80 (5th Cir. 2006) (denying recovery where claim was for lost revenues from inability to use facilities not lost product); *In re Bertucci Contracting Co., L.L.C.,* 712 F.3d 245, 248 (5th Cir. 2013) (denying recovery where bridge damage caused interference with plaintiff's use of property); *but cf. Catalyst Old River Hydroelectric Ltd. P'ship v. Ingram Barge Co*., 639 F.3d 207, 213 (5th Cir. 2011)(sustaining recovery where plaintiff's mitigating act of shutting in facility prevented physical damage meeting the physical harm requirement); *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp*., 71 F.3d 198, 202-03 (5th Cir. 1995) (sustaining recovery where plaintiff shut down production platform to prevent damage caused by another owner's ruptured riser connected to plaintiff's platform); *Pennzoil Producing Co. v. Offshore Exp., Inc*., 943 F.2d 1465, 1468, 1473 (5th Cir. 1991) (sustaining recovery where owner of gas well connected to gas pipeline suffered physical damage caused by allision of vessel with pipeline); *Consol. Aluminum Corp. v. C.F. Bean Corp*., 772 F.2d 1217, 1218-19 (5th Cir. 1985) (sustaining recovery for physical losses and attendant economic damages due to damage to production facility caused by ruptured pipeline); *Vicksburg Towing Co. v. Mississippi Marine Transport Co.,* 609 F.2d 176 (5th Cir.1980)(sustaining recovery by an owner of a dock leased to another for damages to the dock caused by defendant's negligence).

472-73 (5th Cir. 1979) (citing *Dick Meyers Towing Service, Inc. v. United States,* 577 F.2d 1023, 1025 (5th Cir.1978)).

A "critical factor in the application of the *Robins* holding . . . [is] 'the character of the interest harmed.'" *Vicksburg Towing v. Mississippi Marine Transport,* 609 F.2d 176, 177 (5th Cir.1980) (quoting *Dick Meyers*, 577 F.2d at 1025 (footnote omitted)); *see also Consol. Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217, 1222 (5th Cir. 1985). In *Robins Drydock*, Justice Holmes recognized that some charterers of vessels might have "an interest protected by the law against unintended injuries inflicted upon the vessel by third persons" without knowledge of a charter, such as the interests conveyed in a demise charter; if such an interest exists, "it must be worked out through their contract relations with the owners, not on the postulate that they have a right in rem against the ship." *Robins Dry Dock*, 275 U.S. at 308, 48 S. Ct. at 135. The Fifth Circuit elaborated upon Justice Holmes' distinction, noting that, unlike a time-charterer, a "demise-charterer stands in the shoes of the owner of the vessel for the duration of the contract while the shipowner retains merely a right of reversion," and "has full responsibility for managing and maintaining the vessel and if the vessel is damaged, he may be held liable to the owner." *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469, 473-74 (1979). By contrast, in a time-charter, the vessel owner retains possession and control of the vessel, provides necessary crew, fully equips and maintains the vessel performing any needed repairs, and provides insurance on the vessel.[4] In sum, the plaintiff must demonstrate "incidents

---

[4] *Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993). "Under a bareboat or demise charter, on the other hand, the full possession and control of the vessel is transferred to the charterer. The stated consideration for a demise charter is payable periodically but without regard to whether the charterer uses the vessel gainfully or not. Under a bareboat or demise charter the vessel is transferred without crew, provisions, fuel or supplies, i.e. 'bareboat'; and when, and if, the charterer operates the vessel he must supply also such essential operating expenses. Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability." *Id.*

of ownership attributable to the demise-charterer that would justify recovery for damage to physical property." *Bayou Lacombe*, 597 F.2d at 474.

Fifth Circuit precedent thus developed three requirements for establishing a proprietary interest: (1) actual possession or control; (2) responsibility for repair; and (3) responsibility for maintenance. *See IMTT-Gretna v. Robert E. Lee SS,* 993 F.2d 1193, 1194 (5th Cir.1993) (citing *See Texas Eastern Trans. Co. v. McMoran Offshore Explor.,* 877 F.2d 1214, 1225 (5th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 321 (1989)). In *Bayou Lacombe,* the Fifth Circuit denied recovery where a lessee of a damaged bridge never had possession or control of the property, did not use its employees to maintain the bridge, and had no obligation to repair or contribute to the cost of repairs of the bridge in the event of damage by a third party. 597 F.2d at 474. Likewise, in *Texas Eastern*, the plaintiff-lessee of a damaged pipeline did not have exclusive use of the pipeline, actual possession or control of the pipeline, or any obligation or responsibility to repair the pipeline when damaged, and the plaintiff maintained only its own various appurtenances attached to the pipeline. 877 F.3d at 1225. The Fifth Circuit rejected the proposition that "repair of property endows one with a proprietary interest" alone or would endow functional possession or control over the entire pipeline, particularly when the plaintiff's contract with the owner specifically provided that the owner "shall be responsible for the construction, operation, maintenance, repair, and use" of the pipeline. *Id.* The Court noted that, like many businesses requiring transportation facilities, "[a] producer may depend upon use of the transportation facility, but such reliance does not rise automatically to the level of a proprietary interest in that transportation medium." *Id.* at 1224. Thus, because the plaintiff alleged no injury to property it actually owned, the Fifth Circuit denied recovery. *Id.* at 1225.

7

As an initial matter, all of Phillips losses resulted from the repair and shut down of the pipeline through which it transported its oil; regardless of whether the costs were incurred from transportation of the oil through other means or from Phillips' inability to comply with its contractual obligations to Chevron, the costs—economic losses—originate from Phillips' loss of use of the pipeline, which was granted to Phillips through its Service and Operating Agreements with Plains. Great Lakes' motion places at issue whether Phillips' had a proprietary interest in the pipeline. Phillips concedes that Plains owned the pipeline. Nevertheless, Phillips maintains that it has a proprietary interest in the pipeline based on the Service and Operating Agreements, which provide Phillips the sole right of use of the pipeline and requires Phillips reimburse Plains for Plains' obligatory repair and maintenance of the pipeline. (Pl. Opp. 11-14, R. Doc. 48, 11-14; Service Agreement Ex. B at 5, R. Doc. 48-2).

Phillips attempts to avoid the effect of *Robins Drydock*, distinguishing *Bayou Lacombe* and *Texas Eastern* from the instant matter, by characterizing its interest conveyed in the Service and Operating Agreements as being something "closer to that of a demise charterer than that of a time charterer." (Pl. Opp. 10, R. Doc. 48). Yet the facts suggest otherwise. Under the Service and Operating Agreements, Phillips was entitled to the sole use of the pipeline for a certain term and agreed to pay monthly rent for such use. (Service Agreement Ex. B at 3, 4-5, R. Doc. 48-2). Plains, on the other hand, maintained the right as owner to sell substantially all assets of the pipeline. *Id.* at 14. Plains had the obligation or responsibility to operate, maintain, and repair the pipeline with its own employees. (Operating Agreement Ex. C at 9, R. Doc. 48-3). Plains also had the obligation to obtain insurance for the pipeline. *Id.* at 10. However, in addition to its monthly rent, Phillips did agree to reimburse Plains for the lesser of the total fixed costs (including maintenance and repair) or a flat rate of 2.6 million dollars yearly and to pay costs of

insurance. *Id.* at 6, 8. Any reimbursement of Plains' "additional services" relating to the pipeline's operation, however, would require approval by Phillips. *Id.* at 5. In light of these facts, Phillips' interest resembles that of a *time*-charterer where the owner retains most of the incidents of ownership, providing the crew, maintenance, and insurance, rather than that of a demise-charterer.

In contending that it maintains a proprietary interest, Phillips heavily relies on the fact that it paid for maintenance and repairs performed by Plains. This argument requires the inference that reimbursement is both the functional equivalent of having the responsibility to perform maintenance and repair and the functional equivalent of possession and control of the pipeline. In actuality, by contract Phillips had neither the obligation to maintain and repair the pipeline—or to even fully reimburse Plains for those costs—nor actual possession and control of the pipeline. Unlike the plaintiff in *Texas Eastern*, who at the very least performed maintenance to its own fixtures on the pipeline, Phillips only pays a limited sum for services that Plains renders; in fact, in the instant matter, it appears that Phillips did not pay for any of the pipeline's repair costs. Like the plaintiff in *Texas Eastern,* Phillips' contract provided that Plains would have the obligation to maintain, repair, and otherwise oversee the operation of the pipeline. Furthermore, Phillips has not presented any evidence that it assigned any pre-existing obligation to repair or maintain the pipeline to Plains by virtue of the Service and Operating Agreements. That the Operating Agreement states that Phillips "desires to contract" with Plains to manage and operate the pipeline and reimburse it for some expenses does not clearly convey that Phillips had any property interest in the pipeline itself; indeed, the Service Agreement also states that Plains as Pipeline Owner "desires to provide" and Phillips as Refiner Owner "desires to accept" the use

of some portion of the existing capacity of the BOA pipeline,[5] paying service charges "in consideration of the use of the Capacity for the transportation of crude oil." (Service Agreement Ex. B 1, 4, R. Doc. 48-2). Similarly, Phillips' entitlement to any tariffs or other payments from third parties' use or potential use of the pipeline only reinforces the fact that Phillips' had the sole right to use the pipeline during the existence of the contract's term. *Id.* at 5.

Whether Phillips' sole use of the pipeline and reimbursement payments affords it some kind of property interest conveyed by the Service and Operating Agreements, any "property interest created by virtue of its contract with [Plains] form[s] too slender a reed upon which to base a right of recovery despite *Robins*." *Bayou Lacombe,* 597 F.2d 469, 473-74 (5th Cir. 1979). If the Court were to accept Phillips' characterization of the facts, a simple modification of the terms of the Service and Operating Agreements to eliminate reimbursement payments and instead raise rental payments would effectively undermine any supposed "proprietary" interest belonging to Phillips. Thus, effectively, Phillips remains a pipeline lessee, and any alleged negligence causing damage to the pipeline only interfered with Phillips' contractual right to the use of the pipeline.

## IV. CONCLUSION

Despite making factual inferences in the light most favorable to Phillips, it is clear that no genuine issue of material fact exists as to the nature of Phillips' interest in the BOA pipeline. Great Lakes has demonstrated that Phillips lacks the proprietary interest necessary to

---

[5] The Operating Agreement states that "[n]othing in [the Operating Agreement] is intended to or shall be deemed to grant to or confer upon Refinery Owner [Phillips] any property rights in and to the Service Agreement Capacity (or any portion thereof) that are in addition to or greater than the property rights granted to Refinery Owner in the Service Agreement." (Operating Agreement Ex. C at 3, R. Doc. 48-3). The Service Agreement states that it provides Phillips "the Capacity for Refinery Owner's sole use in the transportation of crude oil." (Service Agreement Ex. B at 3, R. Doc. 48-2). "Capacity" is defined as set forth in the terms of the contract to include some portion of the BOA pipeline. *Id.* at 1-2. Again, these terms make clear that Phillips was entitled to the use of the pipeline but by the terms of the contracts did not have actual possession or control of the pipeline or the obligation to maintain and repair the pipeline.

demonstrate physical damage to its property and that, consequently, the *Robins Drydock* rule bars recovery to Phillips' claims for economic losses.

Accordingly,

**IT IS ORDERED** that Great Lakes' Motion for Summary Judgment (R. Doc. 39) is **GRANTED**.

New Orleans, Louisiana, this 29th day of August, 2014.

_____
**STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE**